James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO P.C.**
5 Becker Farm Rd.
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone (917) 438-9189
Facsimile (212) 753-0646
Email: lnussbaum@nussbaumpc.com

[Additional counsel listed on signature page]

*Counsel for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MINETT FERNANDEZ, <br><br>            Plaintiff, <br><br>    -against- <br><br> JOHNSON & JOHNSON CONSUMER INC., <br><br>           Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Minett Fernandez brings this action individually on behalf of herself and as a class action on behalf of all others similarly situated against Defendant Johnson & Johnson Consumer Inc. ("J&J" or "Defendant") for damages, injunctive relief, and any and all other relief available. Plaintiff demands a trial by jury on all issues so triable and complain and allege as follows:

### <u>NATURE OF THE CASE</u>

1.      Consumers purchase sunscreen in order to decrease their risk of developing skin cancer. Skin cancer is the most common form of cancer in the United States, and ultraviolet

radiation from the sun is the number one cause of skin cancer. In order to decrease the risk of skin cancer, medical experts recommend sunscreen.[1]

2. Sunscreen is a key component of skin cancer prevention. Last year alone, the market for suncare products was approximately $8 billion globally, with $1.6 billion of sales in the United States alone.[2]

3. Defendant J&J is one of the largest manufacturers and distributors of sunscreen. Globally, J&J sold over $600 million in suncare products last year, nearly half of which was sold in the United States.[3] Among J&J's products are the widely popular Aveeno and Neutrogena sunscreens.

4. Plaintiff and other consumers purchased J&J's sunscreens to decrease their risk of skin cancer. Little did they know J&J's products contained an undisclosed carcinogen, benzene, that potentially *increases* their chances of developing the very cancer the product is marketed to prevent.

5. According to the Food & Drug Administration ("FDA"), benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or . . . deleterious environmental effect." Where benzene use is "unavoidable in order to produce a drug product with a significant therapeutic advance," its concentration should

---

[1]    Cleveland Clinic, Sun Exposure & Skin Cancer (Oct. 10, 2019), *available at* https://my.clevelandclinic.org/health/diseases/10985-sun-exposure--skin-cancer.

[2]    Michael Erman & Julie Steenhuysen, *FDA Investigating How a Known Carcinogen Wound Up in J&J Suncreen*, Reuters (July 16, 2021), *available at* https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16/.

[3]    *Id.*

be limited to no more than 2 parts per million ("ppm"). Benzene has no therapeutic advance or benefit in sunscreens, and therefore should not be present in such products.

6. Yet in May 2021, the independent lab Valisure announced that it had detected dangerously high levels of benzene in numerous J&J products (the "Sunscreen Products").[4] Notably, Valisure identified benzene levels over 2 ppm in 10 Neutrogena sunscreen batches from five separate product lines, with levels even exceeding 6 ppm in some instances. Additionally, Valisure identified benzene levels between .1 and 2 ppm in thirteen Neutrogena sunscreen batches from ten different product lines.

7. Alarmed by these results, Valisure filed a citizen petition with the FDA to recall the products on May 24, 2021.

8. Despite knowing that its products contained benzene, J&J waited months before recalling five of its products:

- NEUTROGENA® Beach Defense® aerosol sunscreen,

- NEUTROGENA® Cool Dry Sport aerosol sunscreen,

- NEUTROGENA® Invisible Daily™ defense aerosol sunscreen,

- NEUTROGENA® Ultra Sheer® aerosol sunscreen, and

- AVEENO® Protect + Refresh aerosol sunscreen.

9. The remaining J&J products found to contain dangerously high levels of benzene remain on the market.

10. The presence of benzene is a particularly severe betrayal of J&J's customers, who purchased the products to decrease their risk of skin cancer, but who ended up unknowingly

---

[4] The Sunscreen Products include the Neutrogena and Aveeno products listed in Paragraph 8, as well as those identified as containing benzene in the Valisure citizen petition ("Citizen Petition"), attached hereto as Exhibit A.

lathering carcinogens all over their skin. Making matters worse, J&J has long emphasized the safety and health benefits of its products, stressing that they are "#1 Dermatologist Recommended."

11.     Had J&J's customers known that the sunscreens they were using to decrease the risk of skin cancer had actually contained carcinogens, they certainly would not have purchased them.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and one or more of the members of each of the putative Classes (defined below) are citizens of a different state than Defendant.

13.     This Court has jurisdiction over J&J because J&J is incorporated in New Jersey, has its principal place of business in New Jersey, and is authorized to conduct and do business in New Jersey. J&J has marketed, manufactured, promoted, distributed, and sold sunscreen protection products, including the Sunscreen Products, from New Jersey. J&J has established sufficient minimum contacts with this State by having availed itself of the markets in this State through its promotion, manufacture, sale, distribution and marketing of its sunscreen protection products, such that exercise of jurisdiction by this Court is permissible. A substantial portion of all claims alleged on behalf of Plaintiff and the Classes arise out of conduct occurring in New Jersey.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant transacts business in this District and is subject to personal jurisdiction here, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

**A.    Plaintiff**

15.    Plaintiff Minett Fernandez is a resident of Dade County, Florida. Plaintiff Fernandez purchased at least one Sunscreen Product sold by Defendant. Plaintiff Fernandez would not have purchased nor used the Sunscreen Products had Defendant not breached its express and implied warranties, and misrepresented, omitted, concealed, and/or failed to timely disclose the risks associated with the use of the Sunscreen Products. Thus, Plaintiff Fernandez has suffered concrete injury as a direct and proximate result of Defendant's wrongful conduct.

**B.    Defendant**

16.    Defendant Johnson & Johnson Consumer Inc. is a New Jersey corporation with its principal place of business in Skillman, New Jersey. J&J is a subsidiary of the Johnson & Johnson conglomerate and the manufacturer and/or distributor of the Sunscreen Products.

## FACTUAL ALLEGATIONS

**A.    Benzene is a Known Carcinogen Whose Use is Heavily Regulated by the Food & Drug Administration**

17.    Benzene is a simple hydrocarbon found in crude oil, gasoline, and cigarette smoke. It is primarily used as a starting material to make other chemicals, including plastics, lubricants, dyes, detergents, drugs, and pesticides. In the past, it was used as an industrial solvent and gasoline additive. Leukemia, multiple myeloma, non-Hodgkin's lymphoma, and anemia are among the diseases found to be caused by or linked to benzene.[5]

18.    The United States Department of Health and Health Services, World Health Organization, and International Agency for Research on Cancer view benzene as a carcinogen.

---

[5]    American Cancer Society, *Benzene and Cancer Risk*, *available at* https://www.cancer.org/cancer/cancer-causes/benzene.html.

19.     According to FDA, benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity or . . . deleterious environmental effect." Where benzene use is "unavoidable in order to produce a drug product with a significant therapeutic advance," its concentration should be limited to no more than 2 ppm.[6] The National Institute for Occupational Safety and Health recommends protective equipment be worn by any worker expecting to be exposed to benzene at concentrations of 0.1 ppm for over 10 hours or 1 ppm for 15 minutes, and lists "skin absorption" as one way a person could be exposed to dangerous levels of benzene.[7]

20.     The FDA regulates sunscreens as an over-the-counter drug. 21 C.F.R. § 352, *et seq.* The FDA's regulations provide that an "over-the-counter sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets" certain conditions. 21 C.F.R. § 352.1(a).

21.     Benzene is not among the permitted active ingredients for sunscreen. 21 C.F.R. § 352.10 ("Sunscreen Drug Products for over-the-Counter Human Use: Sunscreen active ingredients"). Nor is benzene a suitable inactive ingredient for sunscreen, as inactive ingredients must be "safe in the amounts administered." 21 C.F.R. § 330.1(h) ("General conditions for general recognition as safe, effective and not misbranded"). Without a therapeutic benefit, benzene should not be used in sunscreens.

---

[6]     Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017), *available at* https://www.fda.gov/media/71737/download.

[7]     National Institute for Occupational Safety and Health (NIOSH), *Benzene*, *available at* https://www.cdc.gov/niosh/npg/npgd0049.html.

**B.**     **Valisure Discovers Dangerously High-Levels of Benzene in Defendant's Products**

22.     Valisure is an independent pharmacy well-respected for its work analyzing the safety of consumer products.[8] For example, Valisure gained considerable attention for finding the carcinogen N-nitrosodimethylamine in Zantac and its generic form, ranitidine, leading to a global recall of the one-time best-selling heartburn pill.[9]

23.     In May 2021, Valisure conducted a study on the potential carcinogenicity of sunscreens. During its study, Valisure detected dangerously high levels of benzene in numerous J&J products. This is in stark contrast to other sunscreens Valisure tested, many of which contained no benzene. The lack of benzene in other sunscreens is not surprising, considering that benzene has no known therapeutic benefit that would justify its use in sunscreen.

24.     Products with avoidable levels of benzene do not "contain[] only suitable inactive ingredients which are safe in the amounts administered" or contain only listed active ingredients at levels "that do[] not exceed the amount reasonably required to achieve [their] intended effect." 21 C.F.R. § 352.1(a); 21 C.F.R. § 330.1(e)(h). Accordingly, per FDA guidelines, any significant detection of benzene in the Sunscreen Products should be deemed unacceptable.

---

[8]     *See* Valisure, *Independent Quality Assurance* ("Valisure's mission is to independently check the chemical composition of medications before they reach consumers."), *available at* https://www.valisure.com/.

[9]     Caroyln Y. Johnson, *A Tiny Pharmacy is Identifying Big Problems with Common Drugs, Including Zantac*, Washington Post (Nov. 8, 2019), *available at* https://www.washingtonpost.com/science/a-tiny-pharmacy-is-identifying-big-problems-with-common-drugs-including-zantac/2019/11/08/6dd009ca-eb76-11e9-9c6d-436a0df4f31d_story.html.

25.     Valisure detected unacceptably high levels of benzene in numerous J&J products. In particular, Valisure identified benzene levels over 2 ppm in ten Neutrogena sunscreen batches from five separate product lines.[10]

26.     The amount of benzene in these products reached levels as high as 6.77 ppm, more than three times the amount the FDA would recommend even if there were a therapeutic advance or benefit, which there is not.[11]

27.     Additionally, Valisure identified benzene levels between .1 and 2 ppm in thirteen other Neutrogena sunscreen batches from ten different product lines,[12] and amounts below .1 ppm in three additional products, all of which are unacceptable as benzene is not required to achieve sunscreen's intended effect.[13]

28.     Valisure concluded that the presence of carcinogenic benzene in the Sunscreen Products is particularly troubling as the Sunscreen Products are "widely recommended for the prevention of skin cancer and regularly used by adults and children in large volumes." Furthermore, Valisure noted, because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules," "even a relatively low concentration limit can result in very high total exposure."[14]

29.     The presence of benzene in sunscreen is particularly troubling because, according to researchers at Health Canada's Bureau of Chemical Hazards, the application of sunscreen specifically increases the absorption rate of benzene through the skin. According to one Yale

---

[10]     Citizen Petition at 12 Table 2.

[11]     *Id.*

[12]     *Id.* at 13 Table 3.

[13]     *Id*. at 14-15 Table 4.

[14]     *Id*. at 16.

University researcher and dermatologist, "there is not a safe level of benzene that can exist in sunscreen products."[15]

30.     Following its study, Valisure filed a citizen petition with the FDA, detailing its findings and asking the FDA to recall all batches of sunscreen products in which benzene was detected, including the Sunscreen Products.

31.     As Valisure explained in its petition, the presence of benzene in the Sunscreen Products renders them adulterated under Section 501 of the Federal Drug and Cosmetics Act ("FDCA") and misbranded under Section 502 of the FDCA, in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352, respectively.

32.     Yet despite the prohibition on manufacturing and distributing misbranded or adulterated drugs, J&J waited nearly two months before removing the Sunscreen Products from the market. Furthermore, other J&J products containing dangerously high levels of benzene remain on the market.

33.     Valisure was unable to determine how benzene became present in J&J's sunscreens, which do not list benzene as either an active or inactive ingredient. Valisure proposed contamination as one possible explanation for the presence of benzene in J&J's sunscreens.

34.     To date, however, J&J has not explained why or how benzene is present in the Sunscreen Products, or whether J&J conducted testing that could have and should have detected benzene.

---

[15]     *Id*. at 17 n. 48 (quoting Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology, Yale University, New Haven, CT.).

**C.** **Defendant Deceptively Sells Its Carcinogenic Products to Consumers**

35. J&J has long marketed its sunscreens, including the Sunscreen Products, as safe and healthy, making the presence of carcinogenic benzene in its products particularly shocking.

### *1. Neutrogena*

36. J&J has long represented that its Neutrogena products are "#1 Dermatologist Recommended." The basis for this representation is unclear, and the claim remains unchanged despite Valisure's discovery of carcinogens in several J&J products.

37. J&J's Neutrogena advertising and packaging emphasize the brand's safety and health benefits. For example, in its packaging and advertising for its Neutrogena Ultra Sheer products, which is among the Sunscreen Products, J&J repeatedly describes its products as "clean."

38. J&J uses similar tactics in its commercials. For example, commercials for Neutrogena Ultra Sheer, starring actress Jennifer Garner, prominently display the representation, "#1 Dermatologist Recommended Suncare." In these commercials, Ms. Garner emphasizes the "clean" feel of the product and deems it "the best for your skin."

39. Another commercial, advertising the Neutrogena Beach Defense line, features children playing on a beach and happily being sprayed with Neutrogena sunscreen, the "sun care brand used most by dermatologists and their families." The imagery does not suggest that the children are being sprayed with carcinogens.

40. Such claims are also found on Neutrogena's website. While the FDA requires testing for all sunscreen products, J&J touts its Neutrogena products as "[l]eading the way" in product testing, with an entire page on its website devoted to its high product-testing standards.[16]

---

[16] Neutrogena Product Testing, https://www.neutrogena.com/producttesting.html (last visited Jul. 30, 2021).

41.     According to the Neutrogena website, J&J "not only follow[s] individual country regulations, but also look[s] to incorporate the best thinking and practices from top authorities for skincare products around the world." J&J also states that Neutrogena "set[s] a high bar for using ingredients" which are "screened for quality, manufacturing process, government regulations, published research, and our own ingredient safety databases."[17]

42.     And despite marketing the Sunscreen Products laced with a known carcinogen, J&J also asserts on the Neutrogena website that the safety of its products "goes beyond the ingredients list," with attention also paid to "how our ingredients are used, our manufacturing safeguards, how the products are used, and testing requirements for our products."[18]

43.     Neutrogena even created the "Choose Skin Health Movement," which was purportedly designed to "change the future of skin health and reduce the risk of skin cancer through education, empowerment, and early detection."[19] Several celebrities filmed spots for the campaign, including Ms. Garner and Kerry Washington. In one commercial, Ms. Garner emphasized the statistics on skin cancer and stated that she chooses Neutrogena products because "[she] choose[s] skin health." In another commercial, Ms. Garner states that, every day, she wears Neutrogena Ultra Sheer 45—which comes from the same product line as those found to contain benzene—because she chooses "skin health."

44.     In yet another video, Ms. Washington advises viewers to "[p]rotect yourself and those you love. Choose skin health for a lifetime of healthy skin." Yet choosing Neutrogena, and its benzene-containing products, is not choosing skin health.

---

[17]     *Id.*

[18]     *Id.*

[19]     PR Newswire, *Neutrogena Launches 2016 Choose Skin Health Campaign with Help from Brand Ambassador* (May 27, 2016) .

### 2.     *Aveeno*

45.     J&J's Aveeno products have similar branding. Aveeno products, including the Sunscreen Products, include claims that they have been "Dermatologist recommended for over 65 years."

46.     J&J's Aveeno website also emphasizes its health benefits. For example, J&J's "About Aveeno" webpage advises that it provides "Healthy Skin, Naturally: Nature fuels our healthy spirit, just like healthy skin fuels yours. We research and work with scientists and dermatologists around the world to unlock therapeutic power of nature's most restorative ingredients, giving you clinically-proven products that nurture and care for your skin, so you can care for what's most important in life."[20] The webpage goes on to explain that Aveeno was started by two brothers who believed that "nature holds the secret to human health" after "[t]he famous Mayo Clinic dermatologists recognized [the brothers'] pioneering work."[21]

47.     J&J's Aveeno website also contains a "Commitment to Wellness." According to this webpage, "Good enough' is never good enough for Aveeno®. Our internal standards for safety testing and ingredient quality far exceed those set by regulators around the world. We think about every element we use in every one of our products—where it came from, what it does and how it impacts you and your skin. Only ingredients that pass our strict 5-step safety assurance process are used."[22]

---

[20]     About Aveno, https://www.aveeno.com/about (last visited Jul. 30, 2021).

[21]     *Id*.

[22]     *Id*.

### 3. J&J

48.     In addition to the claims it makes on the Aveeno and Neutrogena websites, J&J also promises a "Safety & Care Commitment." As part of this commitment, J&J claims that "Your safety is our priority. That's why our safety assessment process meets or exceeds industry and regulatory standards for baby and beauty personal care products. It's a process that never ends— we continually review our product ingredients against the latest research and consumer feedback. We believe our process is among the most rigorous in the world and is at the core of our Safety & Care Commitment."[23]

49.     J&J asserts that its "Safety & Care Commitment means that every product is carefully reviewed and evaluated against internationally recognized standards."[24]

50.     J&J's failure to prevent the presence of benzene in the Sunscreen Products constitutes actionable fraud. J&J misled and defrauded consumers by making affirmative misrepresentations that portray the Sunscreen Products as safe and healthy, and omitting from the Sunscreen Products' packaging and marketing materials information about the actual danger of the Sunscreen Products, including any warning to consumers that the Sunscreen Products may contain unacceptable levels of cancer-causing benzene, rendering them adulterated, misbranded and illegal.

51.     The Sunscreen Products do not require benzene as an active ingredient, and even if they did, many of the Sunscreen Products still contain more than the FDA's 2 ppm concentration limit.

---

[23]     Johnson & Johnson, Safety & Care Commitment, https://safetyandcarecommitment.com/commitment (last visited Jul. 30, 2021).

[24]     *Id.*

52. Therefore, the Sunscreen Products are adulterated, misbranded, illegal and unfit for sale in trade or commerce, and legally worthless. No consumer would have purchased the Sunscreen Products had they been truthfully and accurately labeled. Accordingly, Plaintiff and the Classes (defined herein) were injured by paying the full purchase price of the Products.

53. Plaintiff and the Classes purchased the Sunscreen Products believing them to be free of benzene. Because J&J sold Plaintiff and the Classes products that may contain dangerously high levels of benzene, Plaintiff and the Classes were deprived of the benefit of their bargain.

## STATUTE OF LIMITATIONS

**A.      The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover Defendant's Unlawful Conduct**

54. The discovery rule tolled any statute of limitations otherwise applicable to the claims asserted herein.

55. Plaintiff and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the presence of benzene in the Sunscreen Products until Valisure announced its findings in May 2021.

56. Plaintiff and members of the Classes had no knowledge that the Sunscreen Products contained benzene until Valisure announced its findings, or of facts sufficient to place them on inquiry notice of the claims set forth.

57. Until May 2021, no information concerning the presence of benzene in the Sunscreen Products was in the public domain or available to Plaintiff and members of the Classes.

58. For these reasons, the statute of limitations as to the claims of Plaintiff and the Classes did not begin to run until, at the earliest, May 2021.

**B.  Fraudulent Concealment Tolled the Statute of Limitations**

59.     In the alternative, J&J's fraudulent concealment tolled the statute of limitations on the claims asserted by Plaintiff and the Classes.

60.     Under the fraudulent concealment doctrine, the claims of Plaintiff and members of the Classes only accrue upon the discovery that J&J deceived them into purchasing the Sunscreen Products, which contain(ed) carcinogenic benzene.

61.     J&J kept Plaintiff and members of the Classes in the dark by concealing crucial information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiff and members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the presence of benzene in the Sunscreen Products, and therefore were unaware of J&J's deception.

62.     Plaintiff and members of the Classes were unaware of J&J's deceptive conduct and did not know that they were purchasing products containing benzene. Plaintiff and members of the Classes would not have purchased the Sunscreen Products had they known they contained benzene. No information, actual or constructive, was ever made available to Plaintiff and members of the Classes that they were being injured by J&J's unlawful conduct.

63.     Notably, none of the Sunscreen Products list benzene as an active or inactive ingredient, and the FDA significantly limits the use of benzene. Benzene has no therapeutic purpose in sunscreens, and therefore should not have been present in the Sunscreen Products.

64.     Furthermore, J&J's advertising, labeling, and branding stress the healthy and safe nature of their products, including the Sunscreen Products. Nothing in the advertising, labeling, and branding materials would suggest that the Sunscreen Products contained benzene.

65.     Because the presence of benzene was not disclosed to customers until Valisure announced its findings in May 2021, Plaintiff and members of the Classes had no knowledge of

J&J's deception, or of any facts or information that would have caused a reasonably diligent person to investigate whether there was such deception, until at least May 2021.

66. For these reasons, the statute of limitations applicable to the claims of Plaintiff and the Classes was tolled and did not begin to run.

## CLASS ACTION ALLEGATIONS

67. Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes of consumers[25]:

68. **The Nationwide Class:**

All consumers who purchased any Sunscreen Products in the United States for personal use or consumption. Excluded from the Nationwide Class are Defendant and its employees, affiliates, parents, and subsidiaries, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states, and their subdivisions, agencies, and instruments.

69. **The Florida Class:**

All consumers who purchased any Sunscreen Products in Florida for personal use or consumption. Excluded from the Florida Class are Defendant and its employees, affiliates, parents, and subsidiaries, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states, and their subdivisions, agencies, and instruments.

70. The Nationwide Class and Florida Class, are collectively referred to as the "Classes."

---

[25] For avoidance of doubt, Plaintiff is not asserting claims in this action either individually or on behalf of a class relating to personal bodily injury resulting from the use of Sunscreen Products.

71.     The members of the proposed Classes are so numerous that joinder of all members would be impractical. The proposed Classes likely contain thousands or millions of members. The number of class members can be ascertained through discovery.

72.     The representative Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes have been injured by the same wrongful practices of Defendant. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

73.     Plaintiff is an adequate representative who will fully and adequately assert and protect the interests of the Classes, and has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiff nor her attorneys have any interests contrary to or in conflict with the Classes.

74.     There are common questions of law and fact that predominate over any questions affecting only individual members of the Classes, including:

(a) whether J&J's Sunscreen Products contained benzene;

(b) whether J&J's representations and omissions, seen in their marketing, advertising, packaging, labeling, and other promotional materials are misleading, or objectively reasonably likely to deceive;

(c) whether J&J's alleged conduct violates public policy;

(d) whether J&J engaged in false or misleading advertising;

(e) whether J&J's conduct violated the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq*.);

(f) whether J&J's conduct violated the breach of express warranty causes of action in Florida;

(g) whether J&J's conduct violated the breach of implied warranty causes of action in Florida;

(h) whether J&J is liable to Plaintiff and the Classes for unjust enrichment;

(i) whether the statute of limitations was tolled due to the discovery rule and/or fraudulent concealment;

(j) whether Plaintiff and members of the Classes are entitled to treble damages, damages, and/or restitution and the proper measure of that loss; and

(k) whether Plaintiff and the members of the Classes are entitled to declaratory and injunctive relief.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Classes is economically infeasible and procedurally impracticable. While the aggregate damages sustained by the Classes are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Classes could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized actions would result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and the court system because that would result from multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

76. Plaintiff and Class members also seek injunctive relief. They do not have an adequate remedy at law because many of the resulting injuries are reoccurring, and Plaintiff and Class members will be forced to bring multiple lawsuits to rectify the same conduct. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury. Plaintiff and Class members are entitled to an order enjoining J&J from engaging in the unlawful conduct alleged in this complaint, requiring J&J to recall all benzene-containing sunscreen products that it has not yet recalled, implementing procedures to identify other products that may contain benzene, requiring J&J to disclose the amount of benzene in any product it sells, prohibiting J&J from releasing or selling any such products in the future without disclosing their benzene content, and other appropriate equitable relief.

## **FIRST CAUSE OF ACTION**
Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. § 501.201, *et seq*. (On Behalf of the Florida Class)

77. Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

78. Plaintiff Fernandez asserts this claim on behalf of herself and the Florida Class.

79. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

80. Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engaged in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

81.     J&J is engaged in the practice of manufacturing, marketing, distributing, selling, and otherwise placing into the stream of commerce the Sunscreen Products, which constitutes trade and commerce under the FDUTPA.

82.     Plaintiff Fernandez and the members of the Florida Class suffered injury in fact and lost money as a result of J&J's conduct. J&J falsely and misleadingly represented that Sunscreen Products were healthy and safe for consumers, while omitting to disclose that they contained the carcinogen benzene. The presence of benzene rendered the Sunscreen Products unsafe, adulterated, and misbranded. Had Plaintiff Fernandez and members of the Florida Class known the truth about the Sunscreen Products, they would not have purchased the Sunscreen Products.

83.     J&J's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Fernandez and the members of the Florida Class to damages and relief under Fla. Stat. §§ 501.201-213.

84.     Accordingly, Plaintiff Fernandez and the Florida Class seek all damages, injunctive and equitable relief, and attorneys' fees and costs available under the FDUTPA.

## SECOND CAUSE OF ACTION
Breach of Express Warranty (Fla. Stat. Ann. § 672.313)
(On Behalf of the Florida Class)

85.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

86.     Plaintiff Fernandez brings this cause of action on behalf of herself and the Florida Class.

87.     J&J is, and at all relevant times was, a "merchant" with respect to the Sunscreen Products within the meaning of Fla. Stat. Ann. § 672.313 and a "seller" of the Sunscreen Products within the meaning of Fla. Stat. Ann. § 672.313.

88. Plaintiff Fernandez and the members of the Florida Class are, and at all relevant times were, "buyers" within the meaning of Fla. Stat. Ann. § 672.313.

89. In connection with their sale of the Sunscreen Products, by and through statements in labels, publications, and other written materials intended for consumers and the general public, J&J made certain express affirmations of fact and/or promises relating to the Sunscreen Products to Plaintiff Fernandez and the members of the Florida Class, as alleged herein, including that such products were safe for human consumption and fit to be used for their intended purpose. These express affirmations of fact and/or promises include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to the Sunscreen Products.

90. J&J advertised, labeled, marketed, and promoted the Sunscreen Products with such express affirmations of fact and/or promises in such a way as to induce their purchase or use by Plaintiff Fernandez and the members of the Florida Class, thereby making an express warranty that the Sunscreen Products would conform to the representations.

91. J&J's affirmations of fact and/or promises about the Sunscreen Products, as set forth herein, constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, thus creating an express warranty that the goods would conform to the representations.

92. Despite the express warranties J&J created with respect to the Sunscreen Products, J&J delivered Sunscreen Products to Plaintiff Fernandez and the members of the Florida Class that did not conform to J&J's express warranties in that such products were dangerous and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with

their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, J&J breached the express warranties in the following ways:

- J&J represented through their labeling, advertising, and marketing materials that the Sunscreen Products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of the Sunscreen Products and by expressly limiting the risks associated with use within their warnings and labels; and

- J&J represented that the Sunscreen Products were safe for use and intentionally concealed information that demonstrated that they had carcinogenic properties, and that the Sunscreen Products, therefore, were not safer than alternatives available on the market.

93.     J&J had sole access to material facts concerning the nature of the risks associated with the Sunscreen Products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiff Fernandez and the members of the Florida Class could not have reasonably discovered that the risks expressly included in the Sunscreen Products' warnings and labels were inadequate and inaccurate.

94.     As a direct and proximate result of J&J's breaches of express warranties, as alleged herein, Plaintiff Fernandez and the members of the Florida Class sustained an economic loss in an amount to be proven at trial.

95.     Plaintiff Fernandez and the members of the Florida Class gave J&J reasonable notice of their breaches of express warranty and an opportunity to cure such breaches or, in the alternative, were not required to do so because such an opportunity would be unnecessary and futile given that J&J is unable to cure the defect in the Sunscreen Products.

96.     As a result of J&J's breaches of express warranties, as alleged herein, Plaintiff Fernandez and the members of the Florida Class seek an order awarding compensatory and punitive damages, costs, attorneys' fees, and any other just and proper relief available under the law.

## **THIRD CAUSE OF ACTION**
### Breach of Implied Warranty (Fla. Stat. Ann. § 672.314)
### (On Behalf of the Florida Class)

97.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

98.     Plaintiff Fernandez brings this cause of action on behalf of herself and the Florida Class.

99.     At all relevant times, J&J was a merchant with respect to the Sunscreen Products which were sold to Plaintiff Fernandez and the members of the Florida Class and was in the business of selling such products.

100.    Each Sunscreen Product sold by J&J comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used. Fla. Stat. Ann. § 672.314.

101.    J&J breached its implied warranty of merchantability because its products were not in merchantable condition when sold, did not conform to the promises and affirmations of fact made on the products' containers or labels, and/or do not possess even the most basic degree of fitness for ordinary use.

102.    J&J's Sunscreen Products are not fit for their intended use – or any use – because they have dangerous propensities when used as intended, and their use carries an increased risk of developing severe injuries.

103.    Plaintiff Fernandez and the members of the Florida Class have had sufficient direct dealings with either J&J or its agents (including distributors, dealers, and authorized sellers) to establish privity of contract between J&J and Plaintiff Fernandez and the members of the Florida Class.

104.    Further, Plaintiff Fernandez and the members of the Florida Class were the intended third-party beneficiaries of the implied warranties made by J&J to purchasers of their Sunscreen Products.

105.    Plaintiff Fernandez and the members of the Florida Class were injured as a direct and proximate result of J&J's breaches of implied warranties of merchantability because, had they been aware of the unmerchantable condition of the Sunscreen Products, they would not have purchased such products.

106.    As a result of J&J's breaches of implied warranties of merchantability, as alleged herein, Plaintiff Fernandez and the members of the Florida Class seek an order awarding compensatory and punitive damages, costs, attorneys' fees, and any other just and proper relief available under the law.

**FOURTH CAUSE OF ACTION**
Unjust Enrichment
(On Behalf of the Nationwide Class)

107.    Plaintiff assert this claim on behalf of the Nationwide Class.

108.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

109.    As a result of the unlawful conduct described herein, J&J has and will continue to be unjustly enriched. J&J has been unjustly enriched by the receipt of revenues received for the Sunscreen Products, revenues they would not have received had the presence of benzene in the Sunscreen Products been known to consumers.

110.    J&J has benefited from its unlawful conduct and it would be inequitable for J&J to be permitted to retain any of the ill-gotten gains received for its Sunscreen Products.

111.    Plaintiff and members of the Nationwide Class are entitled to the amount of J&J's ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and

members of the Nationwide Class are entitled to a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Nationwide Class may make claims on a pro rata basis.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiff respectfully requests:

a. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Classes as provided by Rule 23(c)(2);

b. That J&J's unlawful conduct be adjudged and decreed violations of the laws set forth above;

c. An injunction requiring J&J to refrain from engaging in the unlawful conduct alleged in this complaint, to recall all other sunscreen products containing benzene, to implement procedures to identify other products that may contain benzene, to require J&J to disclose the amount of benzene present in any product it sells, and to preclude J&J from selling any products without disclosing that they contain benzene and to what extent;

d. Plaintiff and members of the Classes recover damages, including treble damages, to the maximum extent allowed under the law, and that a joint and several judgment in favor of Plaintiff and members of the Classes be entered against J&J;

e. Plaintiff and members of the Classes be awarded restitution for J&J's ill-gotten gains resulting from their unlawful and inequitable unjust enrichment;

f. Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

g. Plaintiff and members of the class be granted such other and further relief as the case may require and the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Dated: August 2, 2021

Respectfully submitted,

*/s/James E. Cecchi*
James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO P.C.**
5 Becker Farm Rd.
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone (917) 438-9189
Facsimile (212) 753-0646
Email: lnussbaum@nussbaumpc.com

Michael Criden
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
mcriden@cridenlove.com

*Counsel for Plaintiff and the Proposed Classes*